**Appeal No. 15-1110**
(Reexamination No. 95/000,611)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

**BENECKE-KALIKO AG**,
                                        Appellant,

v.

**HAARTZ CORPORATION, THE**,
                                        Appellee.

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board.

### BRIEF FOR APPELLANT

Fay Sharpe LLP

Mark D. Klinko
Jude A. Fry
1228 Euclid Avenue
Fifth Floor
Cleveland, Ohio 44115
Telephone: (216) 363-9125
*Attorneys for Appellant*                    December 29, 2014

# CERTIFICATE OF INTEREST

Counsel for the Appellant certifies the following:

1.      The full name of every party or amicus represented by me is:

**Benecke-Kaliko AG**

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

**None**

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

**ContiTech AG, Continental AG, Göppinger Kaliko GmbH, and Continental-Kautschuk-Export GmbH**

4.      The names of all law firms and partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

**Jude A. Fry and Mark D. Klinko**

**Fay Sharpe LLP**

December 29, 2014                          /s/ Mark D. Klinko
Date                                                 Mark D. Klinko

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................ i

TABLE OF AUTHORITIES ........................................................ ii

STATEMENT OF RELATED CASES ...........................................1

JURISDICTIONAL STATEMENT ..............................................1

STATEMENT OF THE ISSUES ...................................................1

STATEMENT OF THE CASE .......................................................2

I.     PRELIMINARY STATEMENT .............................................2

II.    PROCEEDINGS BELOW ......................................................2

STATEMENT OF THE FACTS .....................................................7

I.     THE PRIOR ART ..................................................................7

    A.     Scholz ............................................................................7

    B.     Kopytko .........................................................................7

    C.     McKay ...........................................................................8

    D.     Deanin ...........................................................................8

    E.     Simon and Cree .............................................................8

II.    THE '738 INVENTION .........................................................8

SUMMARY OF THE ARGUMENT .............................................9

ARGUMENT ...............................................................................11

I.     STANDARD OF REVIEW ..................................................11

II.    THE USPTO'S PROCEDURE WAS UNFAIR ....................11

III.   THE INVENTION OF THE '738 PATENT WOULD NOT
    HAVE BEEN OBVIOUS .....................................................14

    A.     The References Fail to Dislcose/Suggest the Gel Content
        Limitation ....................................................................14

    B.     McKay Teaches Away .................................................19

    C.     The Evidence of Commercial Success was not Properly
        Considered ...................................................................22

CONCLUSION ...........................................................................24

# TABLE OF AUTHORITIES

CASES

*Crocs Inc. v. International Trade Commission,*
    598 F.3d 1294 (Fed. Cir. 2010) ....................................................................16

*Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.,*
    807 F.2d 955 (Fed. Cir. 1986) .....................................................................22

*Demaco Corp. v. F. Von Lansdorff Licensing Ltd.,*
    851 F.2d 1387 (Fed. Cir. 1988) ....................................................................23

*In re GPAC Inc.,*
    57 F.3d 1573, 1580 (Fed. Cir. 1995) ...........................................................23

*In re Kahn,*
    441 F.3d 977, 986 (Fed. Cir. 2006) .............................................................16

*In re Klein,*
    647 F.3d 1343 (Fed. Cir. 2011) ....................................................................11

*In re Young,*
    927 F.2d 588 (Fed. Cir. 1991) .....................................................................20

*Innogenetics, N.V. v. Abbott Labs.,*
    512 F.3d 1363 (Fed. Cir. 2008) ....................................................................16

*KSR Int'l Co. v. Teleflex, Inc.,*
    550 U.S. 398 (2007)......................................................................................16

*Leo Pharmaceutical Products, LTD. v. Rea,*
    726 F.3d 1346 (Fed. Cir. 2013) ....................................................................19

*Medichem S.A. v. Robalo S.L.,*
    437 F.3d 1157 (Fed. Cir. 2006) ....................................................................20

*Winner Int'l Royalty Corp. v. Wang,*
    202 F.3d 1340 (Fed. Cir. 2000) .............................................................. 20, 21

STATUTES

28 U.S.C. § 1295(a)(4)(A) ........................................................................................1

35 U.S.C. § 102(b) ................................................................................................2, 4

35 U.S.C. § 103(a).......................................................................................... 2, 4, 5

35 U.S.C. § 282 .....................................................................................................11

## STATEMENT OF RELATED CASES

There have been no other appeals in this matter before this Court or any other appellate court.

This Court's decision will not directly affect any other cases in any court.

## JURISDICTIONAL STATEMENT

The Patent Trial and Appeal Board (the "Board") issued an initial Decision on June 13, 2013 and a Decision on Rehearing on July 21, 2014. These decisions were final determinations of the status of the pending claims in reexamination number 95/000,611.

This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A). A notice of appeal was timely filed on September 22, 2014.

## STATEMENT OF THE ISSUES

1.     Did the Board err by engaging in a procedurally unfair process?

2.     Did the Board err in holding that the prior art discloses or suggests the claimed gel content limitation?

3.     Did the Board err in holding that McKay does not teach away from the use of ethylene propylene diene monomer rubber ("EPDM") and ethylene propylene rubber ("EPM") materials?

4.     Did the Board err in discounting evidence of secondary considerations?

# STATEMENT OF THE CASE

## I.      PRELIMINARY STATEMENT

The claims of U.S. Patent No. 6,663,738 (the "'738 patent") (A41-A46)[1] are directed to methods for producing foils.  The methods yield processing advantages and beneficial product properties (e.g., high mechanical stability, resistance to aging, embossing strength, and grain stability).  Due to these benefits, foils manufactured according to the methods are commercially successful for use in instrument panels and door trim applications of automobiles.

For the reasons discussed below, this Court should reverse the Board's obviousness determination and find that the appealed claims of the '738 patent are patentable.  This Court should also hold that the Board's decision was procedurally unfair.

## II.      PROCEEDINGS BELOW

The '738 patent issued on December 16, 2003.  Appellee's initial request for *inter partes* reexamination was denied on October 27, 2010.  (A137 at first paragraph).  On December 17, 2010, Appellee filed a further Request for *Inter Partes* Reexamination, which was denied.  (*See* A153).  On March 1, 2011, Appellee filed a "Petition from Denial of Request For Inter Partes Reexamination", which was granted.  (A159).  Appellee proposed three rejections: a rejection under 35 U.S.C. § 102(b) based on U.S. Patent No. 4,740,335 ("Scholz") (A81-A86) and two rejections under 35 U.S.C. § 103(a) wherein Scholz served as the primary

---

1 "A__" refers to the relevant pages of the Joint Appendix.

reference.  Although Scholz was considered by the United States Patent and Trademark Office (the "USPTO") during prosecution of the '738 patent, Appellee asserted that there was a substantial new question of patentability and that Scholz could properly be cited as a reference.  Particularly, Appellee submitted the Declaration of Srinivas Pravin Sitaram (the "Sitaram Declaration") (A48-A55) which was alleged to allow Scholz to be "viewed in an entirely new light" (A140).  More particularly, Appellee asserted that the Sitaram Declaration provided evidence that following the procedure disclosed in Scholz led to a gel content falling within the range claimed in the '738 patent.

In the petition decision mailed March 30, 2011, the USPTO granted Appellee's Petition from Denial of Request For Inter Partes Reexamination (A153).  The USPTO decided that three potential rejections, each of which relied upon the Sitaram Declaration as an evidentiary reference, raised a substantial new question of patentability (A157-A159).  In short, the Sitaram Declaration was the lynchpin to the grant of reexamination.

In an Office Action mailed April 1, 2011, the Patent Reexamination Specialist (the "Examiner") rejected all 11 claims of the '738 patent in eight rejections based on either Scholz as evidenced by the Sitaram Declaration; Scholz as evidenced by the Sitaram Declaration and in view of secondary references; and Scholz in view of secondary references.

Appellant filed an Amendment on July 1, 2011.  The Amendment corrected typographical errors in claims 1, 2, 4, 5, 10, and 11; cancelled issued claim 7 and amended claim 1 to recite the features recited in issued claim 7; and added new

3

claims 12-17 (231-A233).  The claim set submitted on July 1, 2011 is the set of claims currently on appeal.

Appellant also submitted declarations by Dr. Volker Hülsewede (the "First Hülsewede Declaration") (A247-A256), Dr. Jürgen Bühring (the "Bühring Declaration") (A257-A259), and Matthias Bedke (the "Bedke Declaration") (A260-A261).  The First Hülsewede Declaration described experiments performed to rebut the Sitaram Declaration.  The Bühring and Bedke Declarations described the commercial success of products produced according to the '738 patent claims.

In an Action Closing Prosecution mailed December 9, 2011, the Examiner rejected the claims as follows:

- Claims 1, 2, 8, and 10-12 under 35 U.S.C. § 102(b) as being anticipated by Scholz as evidenced by the Sitaram Declaration (**Ground A**).

- Claims 1-3, 6, and 8-17 under 35 U.S.C. § 103(a) as obvious in view of U.S. Patent No. 4,740,335 ("Scholz") (A81-A86), U.S. Patent No. 5,717,020 ("Kopytko") (A189-A193), U.S. Patent No. 5,869,591 ("McKay") (A87-A114), and Polymer Structure, Properties and Applications, Cahners Books (1972) ("Deanin") (A115-A135) (**Ground B**).

- Claims 4 and 5 under 35 U.S.C. § 103(a) as obvious in view of Scholz, McKay, Deanin, U.S. Patent No. 4,297,099 ("Simon") (A194-A205), and U.S. Patent No. 5,795,941 ("Cree") (A206-A229) (**Ground C**).

- Claims 1-3, 6, 8-12, and 14-16 under 35 U.S.C. § 103(a) as obvious in view of Scholz, McKay, and Deanin, as evidenced by the Sitaram Declaration (**Ground D**).

- Claims 6, 9, and 13-17 under 35 U.S.C. § 103(a) as obvious in view of Scholz, McKay, Deanin, and Kopytko, as evidenced by the Sitaram Declaration (**Ground E**).

- Claims 4 and 5 under 35 U.S.C. § 103(a) as obvious in view of Scholz, McKay, Deanin, Kopytko, Simon, and Cree, as evidenced by the Sitaram Declaration (**Ground F**).

Appellant submitted another Amendment on February 9, 2012 along with another declaration by Dr. Volker Hülsewede (the "Second Hülsewede Declaration") (A363-A365).

In a Right of Appeal Notice mailed April 20, 2012, the Examiner refused to enter Appellant's claim amendments, indicated that the Second Hülsewede Declaration was considered, and maintained all of the rejections. Appellant then appealed the Right of Appeal Notice to the Board of Patent Appeals and Interferences, which subsequently became the Board.

In the Board's Decision mailed June 13, 2013, the Board both affirmed and reversed the Examiner with respect to Ground A and affirmed the Examiner with respect to Grounds B through F (A11 at first paragraph; and A25 at third full paragraph). In the portion of the Board's Decision analyzing Ground A, reversal of

5

Ground A was based on deficiencies of the Sitaram Declaration.  In particular, the Board cited a number of selections made by Sitaram and stated that

> [t]he choices made by Dr. Sitaram are too numerous to constitute an inherent anticipation of the claimed subject matter.

(A8 at third paragraph).

Appellant filed a Request for Rehearing on July 13, 2013 seeking (i) confirmation that Ground A was reversed and (ii) reversal of Grounds B through F. In a later order dated July 21, 2014 (the "Decision on Rehearing"), the Board clarified that Ground A was reversed but maintained Grounds B through F.  (A29 at first full paragraph).  Regarding grounds D, E, and F, the Board apparently modified the rejections to remove the Sitaram Declaration.  (A34 at first and second full paragraphs).  Moreover, the Board appears to conclude that although the Sitaram Declaration is cited in the Summary of Grounds D through F, since it is not explicitly referred to in discussion, the Sitaram Declaration is not actually relied upon.  (A34 at second full paragraph).  In the Decision on Rehearing, the Board further modified the reasoning behind Ground B to rely on McKay for teaching the gel content limitation of the appealed claims, without providing any explanation as to the underpinning of support for a legal conclusion of obviousness. (A33 at second and third full paragraphs).

Grounds B through F are currently on appeal.

# STATEMENT OF THE FACTS

## I.    THE PRIOR ART

### A.    Scholz

Scholz teaches a process for producing a surface-embossed, deep-drawn article suitable for an interior finish or lining of a motor vehicle.  (A81 at Abstract).  The process includes providing a partially-crystalline polymeric material (e.g., EPM and EPDM) in film form, heating the film-form material to a temperature below the melting point of its crystallites, surface embossing the so-heated material, cooling the embossed material, crosslinking the cooled material, reheating the then-crosslinked material to a temperature above the melting point of the crystallites, and deep drawing the reheated material into the shape of an article.  (A86 at claim 1).  Scholz fails to disclose the gel content of the crosslinked material.  (A5 at third full paragraph).

### B.    Kopytko

Kopytko teaches films and molded articles made of a thermoplastic based on a partially crystalline ethylene-propylene-diene terpolymer (EPDM).  (A189 at Abstract).  Kopytko discloses that crosslinking may be performed to achieve a degree of crosslinking of at least 30% for the EPDM.  In a footnote to Table II, Kopytko further discloses that "Gel content = degree of crosslinking of the EPDM rubber in the TPE" where TPE represents "Thermoplastic Elastomer".  (A192).

### C.    McKay

McKay teaches thermoset elastomers comprising an interpolymer of (a) 15 to 70 weight percent ("wt%") of monomer units derived from at least one α-olefin, (b) 30 to 70 wt% of monomer units derived from at least one vinylidene aromatic compound, and (c) 0 to 15 wt% of monomer units derived from at least one diene. (A87 at Abstract).  McKay discloses that "the inventive materials have a superior balance of properties, as compared to EPM and EPDM based materials".  McKay teaches that EPM and EPDM disadvantageously exhibit low green strength (at lower ethylene contents), higher susceptibility to oil degradation, and resistance of the cured elastomer to surface modification.  (A88 at 2:8-15).

### D.    Deanin

Deanin teaches that gelation can be produced when crosslinks form.  (A120-A121).

### E.    Simon and Cree

Simon and Cree disclose that trimethylolpropantriacrylate is a crosslinking agent.  (A199 at 7:55-58; and A222 at 14:51-58).

## II.    THE '738 INVENTION

The commercial embodiments of products produced according to the claims of the '738 patent, Benecke-Kaliko's TEPEO®2 foils, are considerably more robust in deep-drawing processes than conventional foils.  In particular, conventional materials typically have a process window of 10ºC, whereas the TEPEO®2 materials have a process window of approximately 30ºC (A258 at

8

paragraph 5). Due to the significantly enlarged process window, manufacturing with the TEPEO®2 foils can be performed more flexibly and with less waste. These advantages have led to TEPEO®2 foils being used for series production as a décor surface material for instrument panels and door trims in more than 20 car models (Bühring Declaration, A258-259 at paragraph 6). The turnover share generated with TEPEO®2 foils increased from 1% of Benecke-Kaliko's automotive sector turnover in 2005 to approximately 10% in 2010 (Bedke Declaration, A261 at paragraph 4).

The '738 invention involved the discovery that the claimed methods can be utilized to produce foils at a favorable price point, while maintaining high grain stability and excellent lamination and embossing properties (A42 at 1:61-67).

All of the appealed claims require treating an embossed foil with an electron beam to such an extent that a gel content of approximately 15 to 65% occurs in the radiated embossed foil. Radiated embossed foils having a gel content outside of this range do not exhibit satisfactory grain stability (A251 at paragraph 9). In contrast, radiated embossed foils having a gel content within the claimed range exhibit good grain stability (A254 at paragraph 19).

## SUMMARY OF THE ARGUMENT

The proceedings before the Examiner and the Board were procedurally unfair to Appellant. The USPTO's initial decision to grant the reexamination was based on a misplaced reliance on the Sitaram Declaration. Each substantial question of patentability found by the USPTO explicitly relied upon the Sitaram Declaration. If the Sitaram Declaration had been appropriately found deficient at

9

the outset, there would have been no substantial new question of patentability and reexamination would not have been granted.

The Examiner maintained unsound rejections based on the defective Sitaram Declaration, until the Board finally ruled that the Sitaram Declaration was severely flawed. Several of the Examiner's obviousness rejections explicitly relied upon the Sitaram Declaration as an evidentiary reference. The Board altered these rejections to remove the Sitaram Declaration and, in doing so, made conclusory statements regarding the remaining grounds of rejection without an explanation of the rationale supporting the legal conclusion of obviousness.

In particular, the Board modified the Examiner's reasoning concerning the gel content limitation to rely on McKay without explaining why a person having ordinary skill in the art would have been motivated to attempt to achieve McKay's gel content in Scholz. Appellant had no opportunity to provide new claim amendments or evidence in response to the altered rejections and modified reasoning. Invalidating a presumptively valid patent based on rejections only finally thought out and developed in the Board's Decision on Rehearing is unjust.

The cited references fail to disclose or suggest treating an embossed foil with electron beam to such an extent that a gel content of approximately 15 to 65% occurs in the radiated embossed foil. However, this step leads to superior products (i.e., the TEPEO®2 foils). The Board erred by holding that the gel content limitation is disclosed, by failing to consider evidence that McKay teaches away from the use of EPM and EPDM materials, and by failing to give proper weight to evidence of commercial success – i.e., the Bedke and Bühring Declarations.

10

# ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews the Board's determination of obviousness *de novo*.  *In re Klein*, 647 F.3d 1343, 1347 (Fed. Cir. 2011).

## II.    THE USPTO'S PROCEDURE WAS UNFAIR

Appellee's Request for Reexamination and the USPTO's decision to grant the Appellee's "Petititon from Denial of Request For Inter Partes Reexamination" relied explicitly on the ultimately discredited Sitaram Declaration, both in bullet points and in-depth analysis, to establish a substantial new question of patentability.

Furthermore, despite evidence submitted to the USPTO in the form of the First and Second Hülsewede Declarations, the USPTO maintained its rejections that relied on the Sitaram Declaration as an evidentiary reference.  After three years, the Board finally ruled that the Sitaram Declaration was not a proper evidentiary reference (A34 at first and second full paragraphs).  The Board conceded that Dr. Sitaram made numerous selections purportedly based on Scholz and that these selections were too numerous for Scholz to be considered anticipatory (A8 and second and third paragraphs).  If the USPTO had not erred by ignoring the Sitaram Declaration's deficiencies initially, the Request for Reexamination would not have been granted.

There are several other problems with the USPTO's procedure.  First, Congress has mandated that a "patent shall be presumed valid."  35 U.S.C. § 282.

11

Despite Congress' clear intent, the USPTO does not give this presumption to patents in reexamination proceedings. Second, the USPTO does not permit discovery in reexamination proceedings. Appellant had no opportunity to, for example, take Dr. Sitaram's deposition. Congress corrected this deficiency by creating *inter partes* review proceedings. However, the reexamination proceeding in the present case was granted under the old law. The present case is unique in that *inter partes* reexamination proceedings have since been discontinued due to their deficiencies.

Furthermore, the Board altered the Examiner's rationale for several of the rejections at the eleventh hour (in the Decision on Rehearing) and Appellant had no opportunity to provide rebuttal arguments, new evidence, or claim amendments responsive to the new rationale. Grounds D through F rely upon the Sitaram Declaration. However, the Board later acknowledged various defects in the Sitaram Declaration (A8 at paragraphs 2 and 3). Appellant questioned the Board's reliance on the Sitaram Declaration for the obviousness rejections (A553 at paragraphs 3 and 4). In its Decision on Rehearing, the Board stated that

> [t]he Decision affirmed the obviousness rejections without reference to the Sitaram Declaration. The Examiner also did not appear to explicitly rely on the Sitaram Declaration in making the obviousness rejections, but rather relied upon it making anticipation rejection over in Scholz.

(A34 at second full paragraph). However, in making these rejections the Examiner did explicitly rely on the Sitaram Declaration (A418 at first paragraph; A421 at fourth full paragraph; and A424 at first full paragraph). Appellant was not afforded

any opportunity to submit new evidence or claim amendments in response to the Board's modified reasoning for these rejections.

The Board also modified the USPTO's reasoning for the application of Grounds B, C, E, and F. In particular, the Board stated that

> [t]o the extent McKay's gel content disclosure was not expressly discussed in Rejections B, C, E, and F, we make it clear that McKay's teaching about gel content is applicable to all the obviousness rejections in which McKay is a part (Rejections B-F) since the Examiner had relied upon it for this purpose.

(A33 at third paragraph).

Appellant had no opportunity to provide new evidence or claim amendments to rebut the Board's new conclusory reasoning for rejecting the claims. Additionally, neither the Examiner nor the Board provided any rationale explaining why a person having ordinary skill in the art would have been motivated to attempt to achieve McKay's gel content of 20% or 30% in Scholz's process. Accordingly, the Board erred by relying on the Examiner's mere statement that McKay discloses a gel content within Appellant's claimed range, since the Examiner did not provide a rationale for modifying Scholz to incorporate a gel content of 20% or 30%.

The Examiner's underlying rationale for the asserted grounds of rejection did not hold up on appeal to the Board. Recognizing this fact, the Board – in its Decision on Rehearing – modified the obviousness rejections by removing the Sitaram Declaration as an evidentiary reference and making a conclusory statement that McKay teaches a gel content within the claimed range in an effort to justify the Examiner's flawed reliance on the defective Sitaram Declaration. The Board did

13

not explain its conclusory finding of obviousness based on McKay in the Decision on Rehearing. In particular, the Board did not explain why an ordinarily skilled artisan would have been motivated to attempt to achieve McKay's gel content in Scholz's process.

Appellant submits that a sufficiently persuasive rejection to destroy a valuable property right, such as a patent, should not be repeatedly modified by the USPTO without affording Appellant an opportunity to submit new evidence or claim amendments to rebut the USPTO's new reasoning. In short, it is inequitable to make a new rejection when all avenues of response are closed to the Patent Owner.

## III.    THE INVENTION OF THE '738 PATENT WOULD NOT HAVE BEEN OBVIOUS

### A.    The References Fail to Dislcose/Suggest the Gel Content Limitation

The method claims at issue require treating an embossed foil with electron beams to such an extent that a gel content of approximately 15 to 65% occurs in the radiated embossed foil. The prior art references fail to disclose or suggest this limitation. Both the Board's and the Examiner's rationale regarding how the prior art discloses this limitation has been unclear. The USPTO has offered several different lines of reasoning:

- Kopytko discloses a gel content of at least 30% and it would have been obvious to crosslink Scholz's foil to achieve the gel content disclosed in Kopytko. (A444 at first paragraph).

- Even if Kopytko does not teach a gel content within the claimed range, McKay teaches a gel content within the claimed range and it would have been obvious to apply McKay's gel content teaching to Scholz's process. (A33 at second paragraph).

- It would have been obvious to optimize the extent of crosslinking in Scholz as taught by McKay and Deanin in order to obtain the desired amount of gel content. (A15 at second paragraph).

Each of these lines of reasoning is flawed for the reasons set forth below.

Regarding the first line of reasoning, in its first Decision, the Board initially relied on Kopytko's alleged "explicit teaching" of a gel content of 30% (A12 at first paragraph). Appellant previously argued that the Board had misinterpreted Kopytko because (1) Kopytko discloses a degree of crosslinking of 30%, not a gel content of 30% (paragraph bridging A551-A552); and (2) Kopytko's "30%" disclosure was based on a single component, not for a foil (A552 at first full paragraph). Regarding point (1), Appellant provided evidence that degree of crosslinking and gel content are not equal (Second Hülsewede Declaration, A363 at paragraph 4). Regarding point (2), Appellant noted that Kopytko's 30% disclosure was for its random terpolymer (A190 at 2:2-3).

15

In its Decision on Rehearing, rather than providing any definitive statement regarding whether Appellant's arguments concerning the first line of reasoning were persuasive, the Board merely asserted that the rejection would not be undermined even if Appellant's arguments were persuasive (A33 at second paragraph). In particular, the Board relied on McKay's alleged teaching of a gel content within the claimed range (A33 at second and third paragraph).

Regarding this second line of reasoning, the Board's merely conclusory statement that the rejection would be maintained because of McKay's gel content disclosure is clearly erroneous. "[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some rational underpinning to support the legal conclusion of obviousness." *KSR Int'l Co. v. Teleflex, Inc.,* 550 U.S. 398, 418 (2007) (quoting *In re Kahn,* 441 F.3d 977, 986 (Fed. Cir. 2006)). In particular, merely pointing to the presence of all claim elements in the prior art is not a complete statement of a rejection for obviousness. *See, e.g., Crocs Inc. v. International Trade Commission,* 598 F.3d 1294, 1308 (Fed. Cir. 2010). Instead, "some kind of motivation must be shown from some source, so that the jury can understand why a person of ordinary skill would have thought of either combining two or more references or modifying one to achieve the patented method." *Innogenetics, N.V. v. Abbott Labs.,* 512 F.3d 1363, 1374 (Fed. Cir. 2008).

The Board failed to provide any rationale explaining why a person having ordinary skill in the art would have been motivated to attempt to achieve McKay's gel content in the method of Scholz. Again, this position of the Board (i.e., the

second line of reasoning) is particularly troubling because it was reached at the final stage of the reexamination in the Decision on Rehearing, which affords the Patent Owner no opportunity to submit new evidence or claim amendments.

McKay focused on thermoplastic vulcanizates containing an interpolymer including from 30 to 70 weight percent of at monomer units derived from at least one vinylidene compound (A87 at Abstract).  In contrast, the materials of Scholz and Kopytko do not include monomer units derived from at least one vinylidene compound.  In fact, Scholz and Kopytko focused on EPM and EPDM materials (A84 at 3:50-52; and A189 at Abstract).  McKay repeatedly disparages the use of EPM and EPDM materials relative to its inventive, derived from vinylidene, materials (A87 at Abstract;  and A88 at 1:63 to 2:15.  McKay utilized EPDM in its comparative examples to illustrate these deficiencies (A105 at 35:15-25).

A person having ordinary skill in the art would not have attempted to modify the EPM and EPDM materials of Scholz and Kopytko – which are not derived from aromatic vinylidene monomers – by looking to McKay which requires aromatic vinylidene materials and disparages EPM and EPDM.  On this point, a desirable gel content percentage in McKay's vinylidene-containing compositions would not necessarily be desirable in the EPM and EPDM compositions of Scholz and Kopytko.  Furthermore, although McKay discloses a gel content of 30 percent for its compositions, McKay does not ascribe any particular beneficial properties to this gel content.  Thus, it appears the Board merely pointed to the presence of the claim elements in the prior art instead of providing a complete reasoned statement concerning the motivation behind the rejection.

17

Appellant's argument concerning the lack of motivation to achieve McKay's gel content in Scholz is also applicable to Kopytko's disclosure, assuming the Board's ambiguous statement regarding Kopytko was not an acknowledgment that Appellant's previous arguments were persuasive.

Regarding the third line of reasoning, the Examiner asserted that it would have been obvious to optimize Scholz's extent or crosslinking which would have also optimized the gel content (A413 at second paragraph). Appellant submits that this rationale is based on impermissible hindsight. The Board stated that Scholz is directed to optimizing crosslinking (A12 at first paragraph). Scholz disclosed an optimized method which is described as being "especially suitable" (A85 at 6:16-52).

Appellant provided evidence that Scholz's optimized method does not satisfy the gel content limitation. Dr. Hülsewede produced a foil according to Scholz's optimized method (First Hülsewede Declaration, A252 at paragraphs 11 and 12). The foil exhibited a gel content of only 7% post-irradiation (First Hülsewede Declaration, A253 at paragraph 14). Since, as acknowledged by the Board, Scholz was directed to optimizing gel content and Scholz's optimized method utilized a gel content that failed to satisfy Appellant's gel content limitation, the Examiner's "optimization" rationale is clearly based on impermissible hindsight.

On this point, Appellant notes that almost twelve years passed between the issue date of Scholz and the priority date of the '768 patent. Despite the Examiner's assertion that one skilled in the art would have been motivated to, and capable of, optimizing Scholz's gel content, there is no evidence that any skilled

18

artisan did so in the long intervening time period.  This Court has held that a lengthy intervening time period can be evidence of non-obviousness.  *See Leo Pharmaceutical Products, LTD. v. Rea,* 726 F.3d 1346, 1354 (Fed. Cir. 2013) ("If these discoveries and advances were routine and relatively easy, the record would undoubtedly have shown that some ordinary artisan would have achieved this invention within months of [the prior art].  Instead, this invention does not appear for more than a decade.").

Regarding this optimization line of reasoning, the Board cited McKay's disclosure of a gel content of at least 30% and discussed why it believed a person having ordinary skill in the would have reasonably expected this gel content level <u>could</u> be achieved in Scholz.  (Paragraph bridging A20 and A21).  However, as noted above with respect to the second line of reasoning, the Board erred by not explaining why the ordinarily skilled artisan would have sought to achieve McKay's gel content in Scholz.

### B.    <u>McKay Teaches Away</u>

Appellant previously argued that McKay teaches away from the use of EPM and EPDM materials (*see, e.g.,* A549-A551).  In particular, McKay explicitly teaches that "[t]he inventive materials have a superior balance of properties, as compared to EPM and EPDM based materials" (A87 at Abstract).  Despite being useful in some high temperature applications, EPM and EPDM are taught to be disadvantageous due to low green strength, higher susceptibility to oil attack, and resistance to surface modification (A88 at 2:8-15).

In response, the Board asserted that

19

> McKay therefore is not a universal teaching that EPM
> and EDM [sic] materials should not be used, particularly
> in those conditions where it would be considered
> "advantageous." Moreover, while McKay teaches that its
> own materials have a "superior balance of properties,"
> this teaching does not address or dispute the teachings in
> Scholz … and Kopytko … are useful for the purposes
> disclosed in these publications, such as for an automobile
> dashboard … and films for the automobile industry …
> Consequently, we are not persuaded that one of ordinary
> skill in the art would have been discouraged by McKay
> from using EPM and EPDM materials.

(A31 at final paragraph).

However, when a given course of action (e.g., combining prior art references to reach an obviousness determination) results in simultaneous advantages and disadvantages, the underlying trade-off of benefits both lost and gained should, on balance, be desirable. *Winner Int'l Royalty Corp. v. Wang,* 202 F.3d 1340, 1349 (Fed. Cir. 2000). Appellant submits that it was clear error for the Board to assume that McKay does not teach away from the use of EPM/EPDM materials simply because McKay states a single advantage of EPM and EPDM materials.

When balancing the trade-off of benefits lost and gained, "each reference must be considered 'for its power to suggest solutions to an artisan of ordinary skill … considering the degree to which one reference might accurately discredit another.'" *Medichem S.A. v. Robalo S.L.,* 437 F.3d 1157, 1165 (Fed. Cir. 2006) (quoting *In re Young,* 927 F.2d 588, 591 (Fed. Cir. 1991)). In *Winner*, for example, a trade-off of the security provided by an anti-theft device which was more robust due to its dead-bolt design, but less user-friendly, with the ease of operation provided by an anti-theft device which was more user-friendly due to its ratcheting

mechanism design, but less robust, was not considered a desirable trade-off to one of ordinary skill in the art. *Winner Int'l Royalty Corp.,* 202 F.3d at 1349 (Fed. Cir. 2000).

In other words, it would be reasonable for a person having ordinary skill in the art to refrain from trading one benefit for another if, on balance, the benefit gained does not necessarily outweigh the benefit lost. McKay discloses one advantage of using EPM and EPDM materials: they have applicability in higher temperature applications. However, in comparison, McKay states three disadvantages of using EPM and EPDM materials: (1) low green strength (at lower ethylene contents); (2) a higher susceptibility to oil degradation; and (3) resistance of the cured elastomer to surface modification. Accordingly, McKay teaches materials which are not susceptible to these disadvantages. Furthermore, McKay contains no disclosure that its inventive materials are unsuitable in higher temperature applications. In other words, the purported advantage of EPM and EPDM materials in McKay is disclosed relative to materials that McKay considered to be prior art, not relative to McKay's inventive materials. Accordingly, EPM and EPDM are not taught to possess any advantages over the inventive materials of McKay.

Kopytko relates exclusively to EPDM materials and the materials specifically exemplified in Scholz are EPM and EPDM. Accordingly, a person having ordinary skill in the art would not have combined McKay, which teaches away from the use of EPM and EPDM materials, with Kopytko and Scholz.

21

C.    **The Evidence of Commercial Success was not**

**Properly Considered**

Secondary considerations "can be the most probative evidence of non-obviousness in the record, and enables … the court to avert the trap of hindsight." *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.,* 807 F.2d 955, 960 (Fed. Cir. 1986).  In its discussion of the Bühring and Bedke Declarations, the Board affirmed the Examiner's position that the unclaimed lacquering step might be the reason the TEPEO®2 foils have been commercially successful (A22 at last paragraph).  The Board further asserted that the Bedke Declaration was not persuasive because Mr. Bedke did not compare the TEPEO®2 product to the claims or make a statement that TEPEO®2 was "covered" by the claims (A23 at second paragraph).

Appellant submits the Board failed to consider the entirety of the evidence. In particular, when the Bühring Declaration is considered in view of the experiments conducted by Dr. Hülsewede (*see* A247-A256) it is clear that the commercial success if the TEPEO®2 foils results from the gel content limitation. Furthermore, when the Bedke Declaration is considered in view of the Bühring Declaration, it is clear that the TEPEO®2 foils are produced according to the presently claimed methods.

Dr. Hülsewede conducted several experiments to compare the teachings of Scholz to the presently claimed methods.  Dr. Hülsewede found that foils produced according to the claims of the '738 patent (i.e., utilizing the gel content limitation) exhibit very good grain stability after deep-drawing (First Hülsewede Declaration, A254 at paragraph 19).  In contrast, foils produced according to methods that did

not utilize the gel content limitation resulted in degraded grain stability (First Hülsewede Declaration, A251 at paragraph 9 and A252 at paragraphs 14-16). In particular, there was "severe loss of graining after deep-drawing" (First Hülsewede Declaration, A252 at paragraph 16). Accordingly, it is clear that the claimed gel content limitation, not the lacquering step, is the cause of Appellant's commercial success.

Dr. Bühring explicitly stated that TEPEO®2 foils meet the requirement set forth in claim 1 of the '738 patent (Bühring Declaration, A258 at paragraph 3). The Bedke Declaration refers to the same TEPEO®2 foils. Although the Bedke Declaration does not explicitly state that the TEPEO®2 foils are produced according to the claims of the '738 patent, the Board's position is untenable in view of the Bühring Declaration.

Appellant has provided evidence that the TEPEO®2 product is commercially successful and that this product is produced by the process disclosed and claimed in the '738 patent. This showing is sufficient to establish a *prima facie* case of a nexus between the TEPEO®2 product and the '738 patent claims. *See In re GPAC Inc.,* 57 F.3d 1573, 1580 (Fed. Cir. 1995). Once the patentee demonstrates a *prima facie* nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger. *See Demaco Corp. v. F. Von Lansgdorff Licensing Ltd.,* 851 F.2d 1387, 1393 (Fed. Cir. 1988). Appellant submits that the showing of a nexus has not been rebutted.

In summary, the step of treating the embossed foil with electron beams to such an extent that a gel content of approximately 15 to 65% occurs in the radiated

embossed foil, which is not disclosed or suggested by the cited prior art, led to beneficial results and a commercially successful product (i.e., the TEPEO®2 foil). Appellee's willingness to expend considerable time and money trying to invalidate the '738 patent is an implicit acknowledgement of this fact.  If it was possible to achieve Appellant's results with a gel content outside of the claimed range, then Appellee would have simply designed around the claims of the '738 patent instead of expending considerable time and money on a reexamination proceeding.

## CONCLUSION

For the foregoing reasons, the Board's obviousness determination should be reversed, and Claims 1-6 and 8-17 should be found valid.  The Board's obviousness rejections should be reversed in favor of Appellant.

December 29, 2014                          Respectfully submitted,

FAY SHARPE LLP


By /s/ Mark D. Klinko

       Mark D. Klinko
       Jude A. Fry
       1228 Euclid Avenue
       Fifth Floor
       Cleveland, Ohio 44115
       (216) 363-9125
       mklinko@faysharpe.com

       Attorneys   for   Benecke-Kaliko   AG

## **CERTIFICATE OF COMPLIANCE WITH FED.R. APP. P. 32(a)(7)(B)**

Counsel for Appellant Certifies that the body of this brief, beginning with the "Statement of Related Cases" on page 1 and ending with the last line of the "Conclusion" on page 24, contains 5597 words as computed by Word® 2010, in compliance with Rule 32(a)(7)(B)(ii) of the Federal Rules of Appellate Procedure.

December 29, 2014                                    /s/ Mark D. Klinko

Date                                                            Mark D. Klinko

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 29th day of December, 2014, I caused this BRIEF FOR APPELLANT BENECKE-KALIKO AG to be filed electronically with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Dr. Steven J. Grossman

Grossman, Tucker, Perreault, & Pfleger PLLC

55 South Commercial Street

Manchester, NH 03101

sgrossman@gtpp.com

Upon acceptance by the Clerk of the Court of the electronically filed document, the required number of copies of the BRIEF FOR APPELLANT BENECKE-KALIKO AG will be hand filed at the Office of the Clerk, United States Court of Appeals for the Federal Circuit in accordance with the Federal Circuit Rules.

/s/ Mark D. Klinko

Mark D. Klinko